**ACT–UP, on behalf of its members, Plaintiffs,**

v.

**Commissioner Glenn A. WALP, sued in his individual and official capacity as Commissioner of the Pennsylvania State Police; Dorothy Thomas, sued in her individual and official capacity as Director of the Bureau of Police and Safety, and John Doe, unknown officers of the Commonwealth, Defendants.**

**Civ. A. No. 1:CV–91–0148.**

United States District Court, M.D. Pennsylvania.

Feb. 6, 1991.

Stefan Presser, Legal Director, Scott Burris, American Civil Liberties Union of Pennsylvania, Philadelphia, Pa., for plaintiffs.

Anne K. Fiorenza, Attorney General's Office, Harrisburg, Pa., for defendants.

## MEMORANDUM

RAMBO, District Judge.

Before the court is plaintiff ACT–UP's motion for a preliminary injunction. A hearing on these issues was held before this court on January 30, 1991. The issues relating to the injunction have been briefed by both sides. As the key facts relating to the injunction are either undisputed or uncontradicted in the record, the court will dispense with making formal findings of fact.

## BACKGROUND

ACT–UP is an organization devoted to the raising of public awareness of the AIDS crisis and the petitioning of the government to fund more research to combat the epidemic. According to testimony at the hearing, the individual chapters of ACT–UP are independent of one another in actions, philosophy and infrastructure. For instance, the Philadelphia chapter of the group, members of whom are involved in the case here, does not coordinate activities with or necessarily use the same tactics as, say, the New York chapter. The earmark of apparently all ACT–UP organizations, though, is that they are unabashedly boisterous, demonstrative, and often profane.

In its complaint, plaintiff alleges a number of incidents which it believes amount to a denial of its members' rights by state police organizations under the first and fourteenth amendments. First, plaintiff states that state police attempted to infiltrate an ACT–UP meeting in Philadelphia the Monday before the group planned a protest in Harrisburg at Governor Casey's inauguration. The police did so, according to plaintiff, in order to learn the group's plans for their demonstration. Second, plaintiff alleges that after Governor Casey's inauguration day speech, at which a large number of ACT–UP protestors were present and demonstrated vociferously, a number of ACT–UP members attempted to enter the Capitol building and were barred from doing so by a mounted state police officer. Third, plaintiff asserts that a week later, at the Governor's State of the Commonwealth address, they were denied access to the visitors' gallery at the chamber of the House of Representatives when the gallery was locked to all visitors.

Plaintiff filed this suit pursuant to 42 U.S.C. § 1983, asking for damages, a declaratory judgment that defendants' conduct is unconstitutional, and an injunction against further violations of its members' constitutional rights under the first and fourteenth amendments.

## DISCUSSION

The only relief being requested of the court at this juncture is a preliminary injunction, and the court will thus consider the merits of plaintiff's case only under the narrow standards for that type of relief. In *ECRI v. McGraw–Hill, Inc.*, 809 F.2d 223 (3d Cir.1987), the Third Circuit Court of Appeals enumerated the standards for issuance of a preliminary injunction:

> At the trial level, the party seeking a preliminary injunction bears the burden of producing evidence sufficient to convince the court that (1) the movant has shown a reasonable probability of success on the merits; (2) the movant will be irreparably injured by denial of relief; (3) granting preliminary relief will not result in even greater harm to the other party; and (4) granting preliminary relief will be in the public interest.

*ECRI*, 809 F.2d at 226 (citation omitted).

## I. PRELIMINARY MATTERS

Plaintiff desires to show that defendants have "engaged in a systematic operation designed to frustrate and impede plaintiff's members' efforts to engage in protected conduct and associate with others for purposes of expressing opposition to the government's HIV policies." Plaintiff's Memorandum in Support of Motion for a Preliminary Injunction at 6. The court,

however, believes that the only action by agents of the Commonwealth which may be properly remedied by injunctive relief is the government's closing of the gallery of the House chamber on January 28, 1991. The other complained of incidents—the alleged infiltration of the meeting and so forth—are irrelevant for the purposes of determining whether a preliminary injunction should be granted.

## A. *The Tape Recording*

■ At the hearing, there was considerable testimony relating to a tape recording which plaintiff purports to be a conversation between state police officers which was inadvertently left on ACT–UP's answering machine. The recording is of limited relevance for the purposes of this hearing because plaintiff is not seeking an injunction against investigatory activity by the state. Moreover, plaintiff has not laid a sufficient foundation to allow the court to consider the recording in any event. At the hearing it was revealed that plaintiff's belief that the tape contained the voices of state police officers was based on pure conjecture, arising from the references by the voices to the "barracks" and "the captain's house." For all plaintiff knows, these references could have been made by Marines as well as police officers. Significantly, even plaintiff's members who were convinced they were hearing police on the tape were unsure if it was the voices of state police or City of Philadelphia police. They sent letters of complaint to both. Hearing Transcript, Testimony of Norman Baker, member of ACT–UP, at 16 (hereinafter Hearing Transcript will be cited at [Witness Name] Testimony at ___.). The court cannot consider basically unsubstantiated allegations in determining whether to order injunctive relief.

## B. *The January 14, 1991 ACT–UP Meeting*

■ With regard to the actions of the police at the January 14 ACT–UP meeting, there is no constitutional violation apparent. According to testimony at the hearing, the ACT–UP meeting was open to the general public. While it appears that police officers were present, when they were asked to identify themselves, they did, and when they were asked to leave, they did. Baker Testimony at 19–20. These actions alone do not rise to the level of a constitutional violation.[1]

## C. *Denial of Entrance to the Capitol*

Testimony adduced at the hearing established that after demonstrating loudly, boisterously and profanely at Governor Casey's inauguration speech on January 15, 1991, a group of about 20 ACT–UP members, clearly identified by buttons, banners, and loud shirts, trooped up the hill toward an entrance into the Capitol building. According to testimony, their plan was to have a post-demonstration luncheon at the Capitol cafeteria and to perhaps visit later with some of their representatives. Baker Testimony at 24. As they approached the entrance to the building, one to three state troopers on horseback barred their entrance, and would let them go no further.[2] After the rebuff, the group milled around near the entrance for a period, then proceeded down the walkway toward North Street.

■ The court does not believe that this incident is relevant to the issue of whether an injunction is in order. A preliminary injunction is a drastic remedy, and should issue only when it is apparent that the harmful activity is ongoing and the complaining party is likely to continue to suffer irreparable injury. To establish irreparable harm, a plaintiff must present "a

---

1. As the court understands it, plaintiff was also originally requesting injunctive relief against police surveillance and infiltration, but withdrew that request before the hearing. There is no indication that surveillance such as plaintiff alleged to have experienced is ongoing, or that any plan is in place to surveill or infiltrate ACT–UP.

2. Baker states that the trooper also told him that they would be arrested if they proceeded any further. Baker Testimony at 25. Lieutenant Charles Petry of the Capitol Police, who also was present on the scene, stated that the mounted trooper said no more after informing the group that they could go no further. Testimony of Lieutenant Charles Petry at 105.

clear showing of immediate irreparable injury." *Continental Group, Inc. v. Amoco Chems. Corp.*, 614 F.2d 351, 359 (3d Cir. 1980). Here, there is no indication that the barring of the ACT–UP members from the Capitol on inauguration day was anything more than an isolated incident performed by a state police officer who had overstepped his authority. There is nothing in the record showing any plan authorized or orders given to prevent ACT–UP members from entering the Capitol. There is no testimony establishing that any other of the Capitol's myriad entryways were blocked, which may have provided inferential evidence that an order was given to keep the ACT–UP protestors out of the building.[3] Plaintiff's members have evidently not been denied access since. Indeed, a week later five of the group's members not only easily strolled into the Capitol keep, but held a press conference at the foot of the grand staircase in the rotunda and then, after the governor's speech, gave their own State of the Commonwealth address without molestation. Therefore, though the constitutional rights of that group of protestors may have been violated by the actions of the mounted police officers on inauguration day, the court feels that there is no danger that similar actions will arise in the future, and thus no injunctive action is appropriate with regard to this incident. *See Allee v. Medrano*, 416 U.S. 802, 814, 94 S.Ct. 2191, 2199, 40 L.Ed.2d 566 (1974) ("Isolated incidents of police misconduct under valid statutes would not, of course, be cause for the exercise of a federal court's equitable powers.").

## II. THE CLOSING OF THE GALLERY

The question remains, however, as to whether the closing of the visitors' gallery of the House chamber for the duration of Governor Casey's speech was a violation of plaintiff's members' first amendment

rights and that the danger of recurrence is sufficient to warrant the issuance of injunctive relief.

### A. Likelihood of Success on the Merits

#### 1. The Gallery as a Public Forum

■ The first step in considering the breadth of plaintiff's members' first amendment rights in the House gallery is to determine whether the gallery is a public or a nonpublic forum. Justice Roberts in his concurring opinion in *Hague v. CIO*, 307 U.S. 496, 59 S.Ct. 954, 83 L.Ed. 1423 (1939), crafted the classic definition of public fora, the places in which the government's power to inhibit or control speech is very tightly constrained:

> Wherever the title of streets and parks may rest, they have immemorially been held in trust for the use of the public and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions.

*Hague*, 307 U.S. at 515, 59 S.Ct. at 964 (Roberts, J., concurring). However, simply because a place is open to the public, and the public is allowed to roam about unhindered, it is not *per se* converted into a public forum. *United States v. Grace*, 461 U.S. 171, 177, 103 S.Ct. 1702, 1706–07, 75 L.Ed.2d 736 (1983); *Greer v. Spock*, 424 U.S. 828, 837, 96 S.Ct. 1211, 1217, 47 L.Ed.2d 505 (1976). "The State, no less than a private owner of property, has the power to preserve the property under its control for the use to which it is lawfully dedicated." *Adderley v. Florida*, 385 U.S. 39, 47, 87 S.Ct. 242, 247, 17 L.Ed.2d 149 (1966).

■ If a government body wishes to regulate speech within a public forum, it may do so only through reasonable time, place and manner restrictions which serve a significant government interest and leave

---

**3.** The court is troubled by the fact that the ACT–UP protestors, who are by their own admission an aggressive and resourceful lot, did not attempt to gain entry at another door to the Capitol. It is hard to imagine that a group which had just succeeded in shouting down the Governor's inaugural address would minutes later docilely follow the orders of an obviously wrong (if plaintiff's version of the facts is accepted) police officer. It would have bolstered plaintiff's argument that a constitutional violation had taken place if it did not appear that this group of plaintiff's members did not try so halfheartedly to gain access to the building.

open alternative channels for communication. *United States Postal Serv. v. Council of Greenburgh Civic Ass'ns*, 453 U.S. 114, 132, 101 S.Ct. 2676, 2686–87, 69 L.Ed.2d 517 (1981). Such restrictions may be based on the content of the group's message only if they are necessary to achieve a compelling government interest and are narrowly drawn to attain that goal.

■ The touchstone in determining a place's status as a public or nonpublic forum is its use, that is, whether the locale or facility is frequently used as a place for communicative activity. In *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983), the Supreme Court recognized a third type of forum, a limited public forum, which retains a status between the public forum—places of traditional public debate, and the nonpublic forum—private government property. The limited public forum consists of "public property which the State has opened for use by the public as a place for expressive activity." *Perry Educ. Ass'n*, 460 U.S. at 45, 103 S.Ct. at 955. The Court in *Perry Education Association* further noted that "[a]lthough a State is not required to indefinitely retain the open character of the facility, as long as it does so it is bound by the same standards as apply in a traditional public forum." *Id.* at 46, 103 S.Ct. at 955.

■ In general, the grounds and buildings of state and federal capitol complexes and similar buildings have consistently been held to be public fora. *United States v. Grace*, 461 U.S. 171, 103 S.Ct. 1702, 75 L.Ed.2d 736 (1983) (sidewalk of United States Supreme Court); *Duffy v. Quattrocchi*, 576 F.Supp. 336 (D.R.I.1983) (auditorium where legislature held a one-day public hearing); *Reilly v. Noel*, 384 F.Supp. 741, 744 (D.R.I.1974) ("The record reveals that there is an open-door policy towards the use of the State House Rotunda."); *Jeannette Rankin Brigade v. Chief of Capitol Police*, 342 F.Supp. 575 (D.D.C.1972), *aff'd mem.*, 409 U.S. 972, 93 S.Ct. 311, 34 L.Ed.2d 236 (1972) (grounds of the United States Capitol a public forum). *See also Women Strike for Peace v. Morton*, 472 F.2d 1273, 1287 (D.C.Cir.1972) (Wright, J., concurring) ("There is an unmistakable symbolic significance in demonstrating close to [the center of government] ... which, while not easily quantifiable, is of undoubted importance in the constitutional balance."). Here, there is no doubt about the Pennsylvania Capitol's status as a public forum, particularly the rotunda. Testimony at the hearing shows that many different groups have been allowed access to the interior of the building to demonstrate, protest, and carry on other activities, and that the only restriction appears to be on bringing in implements such as wooden posts for signs which might be used as weapons. Baker Testimony at 29; Testimony of Thomas Topolski, Deputy Secretary for Central Services of Pennsylvania Department of General Services, at 85.

■ The gallery of the House chamber, the place at issue here, presents a different circumstance than the rotunda, however. The gallery is a balcony situated some 20 feet above the floor of the chamber, with no direct means to reach the chamber floor. It consists of approximately ten rows of chairs with twenty chairs per row. Unlike the rotunda, there is no walking traffic through the gallery, no noise except for that on the house floor, and very little room to move. There is a 15 foot tall plexiglass screen dividing the viewers from the participants. Visitors in the gallery do not interact with the representatives on the floor. The Speaker of the House of Representatives may have anyone who is disruptive ejected from the gallery. The gallery, unlike the rotunda, is thus not a public forum in the sense that it is a place "which by long tradition or by government fiat have been devoted to assembly and debate...." *Perry Educ. Ass'n*, 460 U.S. at 45, 103 S.Ct. at 955.

These discrepancies do not mean, though, that the gallery cannot be a limited public forum as envisioned by the Supreme Court in *Perry Education Association*. In *City of Madison Joint School District v. Wisconsin Employment Relations Comm'n*, 429 U.S. 167, 176, 97 S.Ct. 421, 426–27, 50 L.Ed.2d 376 (1976), the Supreme Court held

that school board meetings, once opened to the public, could not "discriminate between speakers on the basis of their employment, or the content of their speech." Similarly, in *Southeastern Promotions, Ltd. v. Conrad,* 420 U.S. 546, 95 S.Ct. 1239, 43 L.Ed.2d 448 (1975), the Court found that a municipal theater was a public forum, and that a city could not ban a controversial stage production from playing there because of vague suspicions that the production might be obscene.[4]

Testimony at the hearing established that the house gallery was usually open to all who wished to enter. To the knowledge of every person who testified for either side the gallery had never been closed during a Governor's State of the Commonwealth address—or rarely closed at all for that matter. *See generally* Testimony of Lieutenant Charles Petry, Capitol Police, at 112; Testimony of State Representative Babette Josephs at 13. The Constitution of the Commonwealth of Pennsylvania in fact guarantees that "The session of each House and of Committees of the whole shall be open unless when the business is such as ought to be kept secret." Pa. Const. art. II § 13. As Justice Brennan stated in *City of Madison Joint School District v. Wisconsin Employment Relations Comm'n,* 429 U.S. 167, 178–79, 97 S.Ct. 421, 428, 50 L.Ed.2d 376 (1976) (Brennan, J., concurring), "when ... a government body has either by its own decision or under statutory command, determined to open its decisionmaking processes to public view and particpation ... [it] has created a public forum dedicated to the expression of views by the general public."

Simply because the House gallery is a place in which visitors are not invited to speak does not mean that there is not communicative activity present which would make the gallery a limited public forum. Indeed, compared with the theater in *Southeastern Promotions,* the gallery of the House chamber is even more a place where communication and expression have traditionally been carried on. Importantly, the communication in the theater is generally only one directional—the players to the audience. In contrast, the communication in the between the chamber and gallery works two ways: the audience listens to the political decisionmaking of the elected officials, and the elected officials receive the message, by the very presence of citizens in the gallery, that they are being watched, that their decisions are being scrutinized, and that they may not act with impunity outside the watchful eyes of their constituents.[5] In fact, the closing of the gallery of the house chamber, the very seat of political power in the Commonwealth, is surely of more moment in the first amendment context than restriction on the availability of a theater for the portrayal of entertainment or satire, even if political in nature.

■ That plaintiff's members would be engaging in protected communicative activity is clear. One need not speak to make a point. *See Brown v. Louisiana,* 383 U.S. 131, 142, 86 S.Ct. 719, 724, 15 L.Ed.2d 637 (1966) (silent vigil in segregated library protected "speech"); *Community for Creative Non–Violence v. Watt,* 703 F.2d 586, 592 (D.C.Cir.1983), *rev'd on other grounds, Clark v. Community for Creative Non–Violence,* 468 U.S. 288, 104 S.Ct. 3065, 82 L.Ed.2d 221 (1984) (sleeping in tents in Lafayette Park is expressive activity). While simply attending the speech and making themselves known through their presence is itself communicative in nature, the ACT–UP members message could go beyond that. According to testimony at

---

**4.** Both the *City of Madison* and *Southeastern Promotions* cases were cited by the Supreme Court in *Perry Education Association* as defining examples of limited public fora. *Perry Educ. Ass'n,* 460 U.S. at 45–46, 103 S.Ct. at 954–56.

**5.** The two-way nature of the communication between gallery visitors and those on the floor was also illustrated in the testimony of Norman Baker, who professed an intimacy with the Cap-

itol and its protocol. He stated that representatives on the floor often turned and waved in recognition to those present in the balcony, and at times would even invite visitors to be with them on the floor. On one occasion, Baker related, Governor Casey, speaking in the chamber, recognized a group of retarded citizens and their parents sitting in the gallery and thanked them for attending. Baker Testimony at 49–50.

the hearing, most of the members who were barred access to the gallery were dressed in colorful garb with the words "ACT-UP" clearly written on the front. Baker Testimony at 49. Thus, they would make their presence known not only as citizens in attendance, but also as members of ACT-UP who would particularly be scrutinizing the Commonwealth's response to the AIDS crisis. The wearing of T-shirts and other apparel, even if only symbolic in nature, has been held to be protected speech under the first amendment. *See Tinker v. Des Moines Indep. Community School Dist.*, 393 U.S. 503, 512–513, 89 S.Ct. 733, 739–740, 21 L.Ed.2d 731 (1969) (students wearing armbands as a protest to Vietnam war was protected speech).

The court holds that the gallery is a limited public forum,[6] that plaintiff's members were denied the ability to engage in protected speech, and, as a result, access may be restricted only by reasonable time, place and manner regulations or in order to protect a compelling governmental interest by the narrowest of means.

### 2. Regulation of Access to the Gallery

■■■ For a time, place or manner restriction to be valid, it may not be based on the content of the speech sought to be restricted. Here, the government admits that the closing of the gallery, though closed to everyone, was aimed at preventing the ACT-UP members access. *See* Testimony of Captain David Miller, Pennsylvania State Police Legislative Liaison, at 67. This is a content-based restriction, and thus any time, place, and manner limits used to carry out the restriction are invalid.

■■■ As a content-based restriction, the closing must be necessary to protect a compelling government interest. While a state undoubtedly has an interest in preserving the decorum in its legislative chambers, there is no indication in the record that there was any reason to believe that the proceedings would be disrupted. The Philadelphia ACT-UP branch is an entirely separate entity from chapters in other cities, whose actions may appear more militant. Members of the Philadelphia group rarely engage in civil disobedience, and work within the confines of the first amendment in trying to get their point across. Baker Testimony at 24. Significantly, the only reasoning which state officials could give for believing that the ACT-UP members might be disruptive were reports that the New York chapter had attempted to shout down a session of the New York legislature and had thrown "objects" at the legislators. *See* Miller Testimony at 67. None of the Commonwealth officials who spoke had made an official investigation into the tactics used by the Philadelphia organization, except for defendant Dorothy Thomas, who stated that she had made an informal investigation, the contents of which were confidential. She did not share the fruits of her research with any other officers. Testimony of Dorothy Thomas, Director of Pennsylvania Department of General Services Bureau of Police and Safety, at 91–95. The court concludes that no compelling government interest was at stake because there was no reasonable basis for fearing that the Governor's speech would be disrupted. *See Tinker v. Des Moines Indep. Community School Dist.*, 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969) (fear of distur-

---

6. It is important to note that the status of the gallery as a limited public forum does not give those who enter *carte blanche* to engage in any type of demonstrative activity they wish. The proposed activity must be compatible with the general use and activity of the locale. *Heffron v. International Soc'y for Krishna Consciousness, Inc.*, 452 U.S. 640, 650–651, 101 S.Ct. 2559, 2565–2566, 69 L.Ed.2d 298 (1981); *Grayned v. City of Rockford*, 408 U.S. 104, 115–16, 92 S.Ct. 2294, 2302–03, 33 L.Ed.2d 222 (1972). For instance, civil rights protestors have the right to hold a silent vigil in a racially segregated library, but may not make a speech in the quiet portions of the library. *Brown v. Louisiana*, 383 U.S. 131,

142, 86 S.Ct. 719, 724, 15 L.Ed.2d 637 (1966). Here, the visitors' gallery has been used only for quiet observation and for passively communicating a citizen presence to legislators. It has not been used for loud or disruptive activity, and, according to the rules of the house, the Speaker may order removed any person who does not observe the decorum of the chamber. Members of ACT-UP admitted at the hearing that they were loud and brash in the places where such activity is appropriate, but planned to be silent and well-behaved in the chamber. If they were not, they would likely be outside the protections of the first amendment with regard to access to the gallery.

bance arising from students wearing black armbands in school insufficient to justify prohibition of protected speech).

■ Even if the interest were compelling, the government did not use the narrowest means possible. They used a club instead of a scalpel. If officials were afraid that visitors would be rude and boisterous, an easily less restrictive response would have been to position several police officers in the gallery. If someone became disruptive, they could be removed.

The closing of the gallery in response to the fear, apparently unsubstantiated, by the state that members of ACT–UP would disrupt the Governor's State of the Commonwealth address is the spitting image of an improper prior restraint—an attempt to suppress speech prior to publication or dissemination. *See* L. Tribe, *American Constitutional Law* 1040 (2d ed. 1988); *Southeastern Promotions, Ltd. v. Conrad,* 420 U.S. 546, 553, 95 S.Ct. 1239, 1244, 43 L.Ed.2d 448 (1975) ("All [the prior restrictions] had this in common: they gave public officials the power to deny use of a forum in advance of actual expression."). The closing of the gallery of the house chamber, which has consistently been open to all who would care to sit and listen, in order to deny access to a particular group is not only in all probability unconstitutional, but also cuts against the grain of the notions of a free and open society embodied in the first amendment. The floor of the legislature is the hearth from which momentous governmental decisions are forged in the Commonwealth, and the right of all citizens of Pennsylvania, regardless of beliefs, to watch the proceedings and to make their presence known is one which should not be abridged lightly. Plaintiff has shown a reasonable probability of success on the merits of the claim that its members' first amendment rights were violated by the closure of the gallery.

### B. Irreparable Harm

■ The court believes that plaintiff's members will suffer irreparable harm to their first amendment rights of speech and assembly if not allowed to sit in the gallery of the House. According to testimony given at the hearing, there are General Assembly budget sessions upcoming for the months of February and March as well as the Governor's budget address today, and, if the gallery is closed, a significant mode of expression for the ACT–UP members will be foreclosed on ongoing basis. Members of ACT–UP have stated their intention to attend the Governor's budget address and other budget meetings, and it by no means stretches the bounds of believability to conclude that the Commonwealth will close the gallery for these sessions as well. Certainly, there has been no indication by the Commonwealth to the contrary, and with the budget address and meeting coming up very soon, there is no other adequate remedy available to ensure plaintiff's members access to the house gallery. *See Allee v. Medrano,* 416 U.S. 802, 814–815, 94 S.Ct. 2191, 2199–2200, 40 L.Ed.2d 566 (1974).

### C. No Greater Harm to the Opposing Party

■ The potential harm to the Commonwealth would appear to be the possibility that there might be break in the decorum of the house chamber should plaintiff's members be allowed to enter. As stated above, this is an unsubstantiated concern and one which certainly does not outweigh the necessity that citizens be allowed to exercise their rights under the first amendment. The harm to the Commonwealth may be remedied quickly by swift action to remove disruptive visitors from the gallery.

### D. Effect on the Public Interest

■ The public has an abiding interest in seeing that state officials do not violate the constitution, even with respect to those members of society with unpopular views or ways of expressing them. That a violation has occurred here is, as discussed at length above, entirely probable. The issuance of an injunction against unconstitutional conduct by state officials sends a clear signal to the community that their rights will be honored and protected.

*See Spring Garden United Neighbors, Inc. v. City of Philadelphia,* 614 F.Supp. 1350, 1354 (E.D.Pa.1985) (citing *Lankford v. Gelston,* 364 F.2d 197 (4th Cir.1966)).

## III. PROCEDURAL PROBLEMS

▇ Despite the distinct probability that a constitutional violation has occurred in the closing of the visitors' gallery and that the possibility of recurrence is real enough to justify granting a preliminary injunction, an injunction may not issue because the proper parties are not before the court.

It was established at the hearing that the Speaker of the House of Representatives, Robert W. O'Donnell, alone has the power to order the visitors' gallery locked. Josephs Testimony at 11, 13–14. Indeed, the rules of the House dictate that only the Speaker of the House, through the sergeant at arms, may close the gallery. *Id.* at 13–14. It was also shown that the driving force behind the closure of the gallery and the meetings at which the security concerns about ACT–UP were voiced was House parliamentarian Clancy Myer. Miller Testimony at 65. It is obvious then, that Speaker O'Donnell, and perhaps the Sergeant at Arms of the House of Representatives, is the party responsible for the closing of the gallery.

The defendants before the court are various state and capitol police officials and a number of John Doe defendants. The record does not reveal that any of these persons violated the constitutional rights of any of plaintiff's members in regard to the incident relevant to the injunction—the closing and blocking of the gallery.

ACT–UP members Norman Baker and Barbara Emes both testified that when they attempted to get into the gallery they were stopped by police, one of whom it was disclosed at the hearing was Lieutenant Charles Petry of the Capitol Police. The version of the facts proffered by Baker and Emes is confusing and somewhat misleading.[7] Apparently, no police, neither state troopers nor Capitol Police, actually blocked plaintiff's members' entry into the gallery. There is no testimony on the record indicating that anyone from these police organizations locked the doors to the gallery or carried out any order barring access to the gallery.[8] The police who informed Baker and the others that the gallery was closed were not guarding access to the gallery, but were in fact three floors

---

**7.** For instance, Baker said the following at the hearing:

A: At two-fifteen, we decided that this was an appropriate time to go up and gain our seat or at least try to gain access to the gallery. As we got up to about the third or fourth step, a couple of police officers came down and told us that we were not allowed to go up there; that indeed the gallery was being closed.

Baker's rendition leaves the impression that he and his companions were on the brink of entering the gallery when they were stopped. Lieutenant Petry's testimony later clarified the situation. This confrontation occurred on the grand marble staircase, apparently only three or four steps above the first floor, in the rotunda. The visitors' gallery is on the fourth floor, and only by a roundabout route can one gain access to the gallery by climbing the grand staircase.

**8.** On Tuesday, February 5, 1991, the day before this order is to issue, plaintiff filed a motion to supplement the record, seeking to have admitted an excerpt from the Journal of the House of Representatives of the Commonwealth of Pennsylvania. In the excerpt is a colloquy between the Speaker of the House and, evidently, a member of the House on the House floor. In the

dialogue, the Speaker appears to state that the state police requested that the gallery be closed due to security concerns. The court has two concerns with the admission of this document. First, the document constitutes double hearsay. The Speaker is relating a conversation with someone from the state police which is reported in this journal. Thus, even if the government records exception would apply to the journal, and the court is not convinced that it would, the original conversation with the state police official would nevertheless be inadmissible hearsay. Second, the court is concerned that the admission of the excerpt will cause undue prejudice to defendants. The submission was made at the eleventh hour, and defendants would not have time to respond to the statements made in there. Further, the court is aware of no reason why the Speaker could not have been called to testify at the hearing, and thus be subject to cross examination by defendants. The comments of the Speaker also contradict testimony by Captain David Miller of the State Police that Clancy Myer, parliamentarian for the House, had contacted him with security concerns about the group. Miller Testimony at 65. These discrepancies could perhaps have been accounted for had Mr. O'Donnell been called to the stand.

**1292**

below the gallery on the marble steps in the rotunda checking ingress to the "E" floor, which houses the office of the Lieutenant Governor, the Capitol press corps, and the entrances to the Senate and House chambers. The officers were allowing only members of the press, the Lieutenant Governor's staff, and government officials with access to the chambers past the mid-point of the staircase. Petry Testimony at 98–99. To get to the gallery via the marble stairs where the Baker party was stopped, one must take a circuitous path. There are easier and far more direct routes via any one of four elevators or two staircases surrounding the rotunda which run straight from the first floor to the fourth floor where the gallery is located. There is no indication that these paths were blocked. The court cannot with a straight face conclude that police only a few steps from the first floor of the rotunda were responsible for barring plaintiff's members from the gallery.

In addition, there is no testimony establishing that any state or capitol police other than Lieutenant Petry and those officers stationed in the rotunda were responsible for keeping plaintiffs out of the gallery. The court does not feel that it can enjoin parties—here, the defendant police commissioners and officers—from doing an act which they never apparently performed in the first place. Moreover, even if the court did order an injunction against the police, it would not help plaintiff because the Speaker could still order the Sergeant at Arms to lock the door to the gallery, police protection or not.

Thus, because the parties against whom injunctive relief in this circumstance would be appropriate are not before the court, plaintiff's request for a preliminary injunction must be denied.

### ORDER

Despite the court's finding that plaintiff's members' first amendment rights were violated by the closing of the House gallery, because the proper parties are not before the court the appropriate relief can not be granted. Therefore, IT IS ORDERED THAT:

1. Plaintiff's motion for a preliminary injunction is DENIED.

2. Plaintiff's motion to supplement the record is DENIED.