Terri SMITH–CARONIA, and Corinne A. Carey, Appellants,

v.

UNITED STATES, Appellee.

Nos. 97–CM–152, 97–CM–154.

District of Columbia Court of Appeals.

Argued June 2, 1998.

Decided June 25, 1998.

Mark L. Goldstone, for appellants.

David B. Goodhand, Assistant United States Attorney, with whom Wilma A. Lewis, United States Attorney, and John R. Fisher and Elizabeth Trosman, Assistant United States Attorneys, were on the brief, for appellee.

Before TERRY, SCHWELB, and FARRELL, Associate Judges.

FARRELL, Associate Judge:

While present in the gallery of the United States Senate watching debate on welfare revision legislation, appellants and others arose from their seats, pointed their fingers at the Senate floor, and repeatedly chanted the word "Shame." The presiding officer of the Senate heard the voices and called for order to be restored. Appellants did not stop chanting until they were removed from the gallery. They were subsequently arrested and charged with violating D.C.Code § 9–112(b)(4) (1995), which makes it unlawful for any person or group of persons, willfully and knowingly,

[t]o utter loud, threatening, or abusive language, or to engage in any disorderly or disruptive conduct, at any place upon the United States Capitol Grounds or within any of the Capitol Buildings with intent to impede, disrupt, or disturb the orderly conduct of any session of the Congress or either House thereof, or the orderly conduct within any such building of any hearing before, or any deliberations of, any committee or subcommittee of the Congress or either House thereof.

Following a bench trial, the court found appellants guilty as charged and, in a thoughtful written opinion, denied their motions to dismiss the charges on First Amendment and Due Process grounds.

On appeal, appellants primarily argue that § 9–112(b)(4), unless limited by judicial construction to behavior that causes "an actual, material" disruption of congressional business, punishes protected expression in violation of the First Amendment. Read to prohibit any "disorderly or disruptive" activity in the Senate gallery, they contend, the statute overregulates expressive activity in a "limited" or "designated public forum" and is constitutionally overbroad. We reject these arguments.

For purposes of First Amendment analysis, "[t]his court has recognized and adopted the Supreme Court's classification of types of government property." *Markowitz v. United States*, 598 A.2d 398, 403 (D.C.1991). The Supreme Court has recently summarized those types of speech fora as follows:

> [T]raditional public fora are open for expressive activity regardless of the government's intent. The objective characteristics of these properties require the government to accommodate private speakers. The government is free to open additional properties for expressive use by the general public or by a particular class of speakers, thereby creating *designated public fora*. Where the property is not a traditional public forum and the government has not chosen to create a designated public forum, the property is either a *nonpublic forum* or not a forum at all.

*Arkansas Educ. Television Comm'n v. Forbes*, — U.S. —, —, 118 S.Ct. 1633, 1641, 140 L.Ed.2d 875 (1998) (emphases added). Contrary to appellants' premise, the government questions whether the Senate gallery is even a "designated public forum," since it has not "traditionally [been] held open for the use *of the public* for expressive activities," *Pearson v. United States*, 581 A.2d 347, 353 (D.C.1990) (emphasis added); rather, the public is admitted to the gallery to observe, nothing more. Appellants rejoin that "communicative activity [remains] present" in the important sense described by the District Court in *ACT–UP v. Walp*, 755 F.Supp. 1281 (M.D.Pa.1991):

> [T]he communication ... between the chamber and gallery works two ways: the audience listens to the political decision-making of the elected officials, and the

elected officials receive the message, by the very presence of citizens in the gallery, that they are being watched, that their decisions are being scrutinized, and that they may not act with impunity outside the watchful eye of their constituents.

*Id.* at 1288 (deciding that the Pennsylvania House of Representatives gallery is a limited public forum). Still, as the Supreme Court has recognized, fitting a government property into one forum type rather than another is of "limited utility" if the nature and extent of government regulation at issue would withstand First Amendment analysis under either. *See Members of the City Council of the City of Los Angeles v. Taxpayers for Vincent,* 466 U.S. 789, 815 n. 32, 104 S.Ct. 2118, 80 L.Ed.2d 772 (1984); *see also Pearson,* 581 A.2d at 354. In assessing the constitutionality of § 9–112(b)(4), we conclude that nothing turns on whether the Senate gallery is a designated public forum rather than a nonpublic forum, and so we do not decide that issue.

As with a traditional public forum, if the government seeks to limit the content of expression in a designated public forum, such "regulation must serve a compelling state interest and must be narrowly drawn to achieve that end." *Markowitz,* 598 A.2d at 403. But "[i]f the restriction is content-neutral, the state may impose reasonable time, place, and manner restrictions on the speech." *Id.* Such restrictions are perforce reasonable if they are "narrowly tailored to serve a significant government interest, and leave open ample alternative channels of communication." *Perry Educ. Ass'n v. Perry Local Educators' Ass'n,* 460 U.S. 37, 45, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983); *United States v. Wall,* 521 A.2d 1140, 1143 (D.C. 1987).

Section 9–112(b)(4) comfortably meets these standards. It is viewpoint-neutral on its face and imposes reasonable time, place, and manner restrictions on speech consistent with the significant government interest it

serves, while leaving open ample means of communication not calculated to disrupt the orderly conduct of the legislature's business. Indeed, this court already has held as much. In *District of Columbia v. Gueory,* 376 A.2d 834 (D.C.1977), we sustained against First Amendment challenge an almost identically worded Commissioner's Order (issued under the then Commissioner form of government) which made it a crime to

utter loud, threatening, or abusive language, or engage in any disorderly or disruptive conduct within any building or part of any building owned or under the control of the District of Columbia with the intent to impede, disrupt, or disturb the orderly conduct of any meeting, hearing, or other proceeding of the District of Columbia Council, or of any committee or subcommittee thereof, or the orderly conduct of official business of any officer, employee, or agency of the District of Columbia Government.

*Id.* at 836. We held that the Order "regulates the manner in which viewpoints are expressed, ... does so in a way that is facially neutral regarding content," and leaves open "alternative means by which persons ... can communicate their views without resort to disruption." *Id.* at 838 (citation omitted). We construed the Order as prohibiting only " 'actual or imminent interference' with the peaceful conduct of governmental business," including "loud, threatening or abusive language ... disruptive, or nearly so, of normal governmental process." *Id.* at 837 (citations omitted). Moreover, it "only proscribes activity undertaken with the specific intent to cause disruption." *Id.* at 838. In short, the Order was "sufficiently narrowed to the legitimate state interest [of preserving governmental order] that it serves," and so comported with the First Amendment. *Id.* at 839.

Appellants offer no valid reason for holding differently as to § 9–112(b)(4).[1] Unques-

---

1. We discern no merit in their suggestion that the Senate chambers, as part of the seat of national government, must tolerate more "disruption" of official business than the District's council chambers. And, although § 9–112(b)(4) reaches disruptive conduct occurring "at any

place upon the United States Capitol grounds" (the Commissioner's Order extended only to conduct within government buildings), the statute otherwise is limited exactly as was the Order: it punishes only behavior "disruptive, or nearly so," *id.* at 837, and then only when engaged in

tionably, the statute furthers a significant government interest, summed up in the committee report accompanying its enactment: "[P]eople with strong feelings must be assured of the rights of freedom of expression and of assembly and the right to petition their Government, but under no circumstances should the guarantee of these rights be extended to a license for a minority to delay, impede, or otherwise disrupt the orderly processes of the legislature which represents all Americans." H.R.REP. No. 745, 90th Cong., 1st Sess., *reprinted in* 1967 U.S.C.C.A.N. 1739, 1740; *see also State v. Linares,* 232 Conn. 345, 655 A.2d 737, 750 (1995) ("[I]t is clear that the state has a significant interest in ensuring that the General Assembly, whether sitting in a session, meeting, proceeding or committee, has the opportunity to fulfill its mandate free from objectively unreasonable interferences."). Moreover, by restricting the prohibited conduct to loud speech and other acts both of a nature to and specifically intended to disrupt the business of Congress, the statute is narrowly tailored to serve that government interest. *See Gueory,* 376 A.2d at 837 ("[A]ttempted disruption of government meetings and of daily business is not conduct protected under the First Amendment's guarantees.").

 On the assumption, therefore, that the Senate gallery is a designated public forum, § 9–112(b)(4) readily meets the constitutional standard for regulation of speech in such a setting. For the same reasons, we hold that the statute is not "overbroad" in First Amendment terms, and there is no need for a judicial construction limiting it to include only "actual, material" (or more than "*de minimis*") disruptions, as appellants would urge. Indeed, in *Gueory* we rejected nearly the same argument that, to survive overbreadth challenge, the Commissioner's Order could be invoked only when a disturbance had "actually occur[red]." *Id.*

 Appellants' overbreadth argument derives from the Capitol Police officer's difficulty at trial in explaining when conduct such as wearing a T-shirt with a printed message,

without any other speech activity, would fall within the proscribed disruption. But it is basic law that "even if there are marginal applications in which a statute would infringe on First Amendment values, facial invalidation [because of overbreadth] is inappropriate if the 'remainder of the statute ... covers a whole range of easily identifiable and constitutionally proscribable ... conduct.'" *Parker v. Levy,* 417 U.S. 733, 760, 94 S.Ct. 2547, 41 L.Ed.2d 439 (1974) (citation omitted); *see also Broadrick v. Oklahoma,* 413 U.S. 601, 615, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973). Appellants' own actions in standing, pointing, and chanting "Shame" fell undeniably within that range, as do the examples of "laughing, gasping, cheering, [or] hissing"— each done with specific intent to disrupt— which in their view Congress constitutionally should be required to tolerate. Other marginal applications of the statute which appellants hypothesize to suggest unfettered discretion are much too insignificant to call into question the facial validity of the statute. *See Gueory,* 376 A.2d at 839 ("[T]he regulation does not involve the broad type of administrative discretion that, through on-the-spot application, would tend to chill First Amendment rights.") (citation omitted).

 Finally, we reject appellant's separate argument that their right to Due Process was violated because the Capitol Police failed to warn them that they were violating § 9–112(b)(4) and to give them an opportunity to cease and desist. Unlike statutes that by their terms mandate some sort of warning before arrest, *see, e.g., Washington Mobilization Comm. v. Cullinane,* 184 U.S.App. D.C. 215, 224, 566 F.2d 107, 116 (1977) (failure-to-move-on statute expressly required as element "refus[al] to move on when ordered by the police"), § 9–112(b)(4) gave appellants all the warning to which they were constitutionally entitled.

*Affirmed.*

---

with specific intent to disrupt the orderly business of Congress. Any hypothetical application of the statute to acts committed on the Capitol grounds well away from where the business of

Congress is carried out provides no basis for invalidating the statute on its face. See ensuing discussion in the text, *infra.*