Ben W. ARMFIELD, Appellant

v.

UNITED STATES, Appellee.

No. 01–CM–274.

District of Columbia Court of Appeals.

Argued May 8, 2002.

Decided Dec. 5, 2002.

Ben W. Armfield, pro se.

Michael C. Liebman, Assistant United States Attorney, for appellee. Roscoe C. Howard, Jr., United States Attorney, and John R. Fisher, Thomas J. Tourish, Jr., Luis A. Lopez, Siu P. Wong, and Melinda J. Foster, Assistant United States Attorneys, were on the brief for appellee.

Before TERRY and STEADMAN, Associate Judges, and NEBEKER, Senior Judge.

TERRY, Associate Judge:

Appellant Ben Armfield was convicted of disrupting the House of Representatives, in violation of D.C.Code § 9–112(b)(4) (1995).[1] On appeal he contends (1) that the statute is unconstitutional as applied to him because it violates his right to free speech and to petition the government under the First Amendment; (2) that the statute is unconstitutional because it violates his right to equal protection and due process of law under the Fifth Amendment; (3) that the government presented insufficient evidence to support his conviction; and (4) that the prosecutor made two

---

1. Recodified as D.C.Code § 10–503.16(b)(4) (2001). This statute provides, in pertinent part:

(b) It shall be unlawful for any person or group of persons willfully and knowingly:

\* \* \*\* \*

(4) To utter loud, threatening, or abusive language, or to engage in any disorderly or disruptive conduct, at any place upon the United States Capitol Grounds or within any of the Capitol Buildings, with intent to impede, disrupt, or disturb the orderly conduct of any session of the Congress or either House thereof . . . .

improper comments during closing argument that prejudiced his defense. We affirm.

I

On September 14, 2000, appellant went to the visitors' gallery of the House of Representatives in the United States Capitol. At that time the House was in session, debating an appropriations bill for the District of Columbia. Officer Ryan Schauf, a member of the Capitol Police, noticed appellant as he entered the gallery and took a seat in the first row. From prior experience, the officer suspected that appellant was going to attempt to make a statement from the gallery. Officer Schauf approached appellant and asked whether he was going to disrupt the session; appellant replied, "I don't know yet."

A few minutes later, when the House was voting on the appropriations bill, appellant told Officer Schauf that he was "going to do it now." Appellant then "stood up or started to stand from his chair and yelled out 'Mr. Speaker, Mr. Speaker.'" Despite warnings from Officer Schauf telling him to sit down and be quiet, appellant continued to speak in a loud voice for about a minute. The Speaker of the House heard appellant, as did another Capitol Police officer standing 100 feet away. The Speaker went to the rostrum, struck his gavel, and requested that the Sergeant at Arms restore order in the gallery. Appellant then fell silent. Officer Schauf escorted him out of the gallery and placed him under arrest.

Appellant testified that he had planned to make a statement immediately after the House vote on the District of Columbia appropriations bill in order to protest the fact that District residents do not have voting representation in Congress. He said that he did not intend to disrupt the proceedings, but expected instead to wait for a pause in the proceedings after the vote was "officially over." He admitted, however, that the voting might still have been going on when he made his "statement" from the gallery. Appellant also admitted that he "wanted [his] message to be heard" by all the members of the House who were present.

II

A. *The First Amendment Claim*

Appellant contends that the statute prohibiting the disruption of either House of Congress is unconstitutional as applied to him because he is a citizen of the District of Columbia, unrepresented by a voting member of Congress, who has a right to petition Congress under the First Amendment. Section 9–112(b)(4) makes it unlawful for any person "willfully and knowingly ... to utter loud ... language, or to engage in any disorderly or disruptive conduct, at any place ... within any of the Capitol Buildings with intent to impede, disrupt, or disturb the orderly conduct of any session of the Congress or either House thereof ...." According to appellant, the statute violates his First Amendment right to petition Congress and to voice his opinion when Congress is enacting legislation for the District of Columbia. He maintains that the gallery of the House of Representatives should be open to the citizens of the District for public comment when the House is considering legislation related to the District. We cannot accept such an argument.

The First Amendment states, "Congress shall make no law ... abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances." U.S. CONST. AMEND. I. While the Supreme Court has recognized that "[t]he right of free public

discussion of the stewardship of public officials ... [is] a fundamental·principle of the American form of government," *New York Times Co. v. Sullivan,* 376 U.S. 254, 275, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964) (footnote omitted), this right is not without limits. In particular, when someone claims the right to speak in a public place, "[t]he crucial question is whether the manner of expression is basically incompatible with the normal activity of a particular place at a particular time." *Grayned v. City of Rockford,* 408 U.S. 104, 116, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972).

Section 9–112(b)(4) was held to be constitutional as written in *Smith–Caronia v. United States,* 714 A.2d 764 (D.C.1998). We said in *Smith–Caronia,* a case with facts very similar to those presented here,[2] that section 9–112(b)(4) is "viewpoint-neutral on its face and imposes reasonable time, place, and manner restrictions on speech consistent with the significant government interest it serves, while leaving open ample means of communication not calculated to disrupt the orderly conduct of the legislature's business." *Id.* at 766. We did not decide, however, whether the Senate gallery (or, by extension, the House gallery) was a designated public forum or a non-public forum for First Amendment purposes, *see id.* at 765; *see also Markowitz v. United States,* 598 A.2d 398, 403 (D.C.1991), *cert. denied,* 506 U.S. 1035, 113 S.Ct. 818, 121 L.Ed.2d 689 (1992), and we see no need to rule on that point in this case either.

■ When a particular forum is designated as "public" for First Amendment purposes, it must be open to all speakers; the government may not limit access to certain groups while excluding others. *See, e.g., Widmar v. Vincent,* 454 U.S. 263, 102 S.Ct. 269, 70 L.Ed.2d 440 (1981) (rule giving access to university facilities to all registered student organizations except religious groups held unconstitutional); *Carey v. Brown,* 447 U.S. 455, 100 S.Ct. 2286, 65 L.Ed.2d 263 (1980) (ordinance that prohibited all picketing except by members of labor unions held unconstitutional); *Police Dep't of the City of Chicago v. Mosley,* 408 U.S. 92, 92 S.Ct. 2286, 33 L.Ed.2d 212 (1972) (same); *Niemotko v. Maryland,* 340 U.S. 268, 71 S.Ct. 325, 95 L.Ed. 267 (1951) (grant of permission to use parks to some groups but not others held unconstitutional); *see also Fedorov v. United States,* 600 A.2d 370,. 377 n. 8 (D.C.1991) (en banc) ("Just as discrimination based on race or religion is clearly forbidden by the Constitution, 'so is discrimination on the basis of protected First Amendment activities ....'" (citations omitted)).

■ Appellant argues that residents of the District of Columbia, of whom he is one, should be able to use the House gallery as a special public forum to substitute for their lack of direct representation in Congress. This argument flies in the face of well-established First Amendment principles. Even if we were to decide that the House gallery is a "public" forum under relevant Supreme Court precedents, that gallery could not be held open for First Amendment expression solely for residents of the District. The Constitution does not confer any special rights on residents of the District of Columbia that are denied to residents of the fifty states. In particular,

---

**2.** The defendants in *Smith–Caronia* stood up in the gallery of the Senate chamber during a debate on welfare reform, "pointed their fingers at the Senate floor, and repeatedly chanted the word 'Shame.' The presiding officer of the Senate heard the voices and called for order to be restored. Appellants did not stop chanting until they were removed from the gallery." 714 A.2d at 765. They were convicted of violating section 9–112(b)(4), and on appeal we affirmed their convictions.

District residents cannot have a First Amendment forum reserved for them that is not available to other persons or groups. Furthermore, if the gallery were opened for First Amendment expression to all groups or individuals, section 9–112(b)(4) would be useless as a means of preserving order in the House or Senate. Section 9–112(b)(4), as we held in *Smith–Caronia,* permissibly regulates the First Amendment activities of all persons, regardless of where they reside. We hold that District of Columbia residents do not and cannot have any special First Amendment rights that are not equally available to other persons who live outside the District.[3]

### B. *The Fifth Amendment Claim*

 Appellant also argues that section 9–112(b)(4) deprives him of equal protection of the laws under the Fifth and Fourteenth Amendments. He cannot seek relief under the Fourteenth Amendment, of course, because it applies only to the states and not to the District of Columbia. *See Bolling v. Sharpe,* 347 U.S. 497, 499, 74 S.Ct. 693, 98 L.Ed. 884 (1954); *Smith v. United States,* 460 A.2d 576, 578 n. 3 (D.C. 1983). To the extent that appellant relies on equal protection principles inherent in the due process clause of the Fifth Amendment, *see Bolling,* 347 U.S. at 500, 74 S.Ct. 693; *Smith,* 460 A.2d at 578 n. 3, his argument fares no better than his First Amendment claim.

Section 9–112(b)(4) is not the source of the differential treatment of which appellant complains. That statute applies to "any person or group of persons," making no distinction between residents of the District and anyone else. It is the Constitution itself which is the cause of appellant's frustration about his lack of representation in Congress. *See Adams v. Clinton,* 90 F.Supp.2d 35, 67–68 (D.D.C.) (dismissing a suit by District of Columbia citizens seeking the right to vote for a member of Congress because the Constitution grants that right only to residents of the states, not to residents of the District), *aff'd,* 531 U.S. 941, 121 S.Ct. 336, 148 L.Ed.2d 270 (2000). We obviously cannot declare the Constitution, or any part of it, unconstitutional, not only because we are bound by our judicial oaths to support the Constitution, but also because, as a matter of simple logic, the Constitution cannot be in contravention of itself.

For these reasons, appellant's equal protection challenge to section 9–112(b)(4) must fail.[4]

### III

 Appellant also contends that the evidence was insufficient to show that he had the specific intent to "impede, disrupt, or disturb" the orderly conduct of the House. We have not squarely addressed the question of what kind of evidence is required to establish the specific intent

---

**3.** As the government points out, there are several other ways in which residents of the District can make their views known to Congress besides speaking from the House or Senate gallery. For example, they can write letters to any member of Congress, including their own non-voting congressional delegate. They can make speeches or hold rallies in other places. They can even contact the media to convey their messages to Congress or to the world at large. There are, in short, "ample alternative channels of communication." *Perry Education Ass'n v. Perry Local Edu-*

*cators' Ass'n,* 460 U.S. 37, 45, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983).

**4.** If section 9–112(b)(4) actually interfered with resident voting rights, which it does not, it might be likely to receive some degree of heightened scrutiny for equal protection analysis. *See Adams v. Clinton,* 90 F.Supp.2d at 101 (Oberdorfer, J., dissenting in part and concurring in part). Then again, it might not. We express no views on this question.

necessary for conviction under section 9–112(b)(4). We have said, however, that when three defendants stood up in the gallery of the House while it was in session and shouted about the issue of homelessness, their conduct "clearly fell within the elements of the offense." *Hasty v. United States,* 669 A.2d 127, 132 n. 5 (D.C.1995) (discussing the conduct of the defendants in *Reale v. United States,* 573 A.2d 13 (D.C.1990)).

In the instant case, appellant stood up and spoke loudly with the intent, *by his own admission,* that the members of the House hear him on the subject of appropriations for the District. The evidence showed that the Speaker of the House did indeed hear him: appellant's interruption prompted the Speaker to bang his gavel and ask the Sergeant at Arms to restore order in the gallery. We hold that this evidence, like that described in *Hasty,* is sufficient to show the specific intent necessary for a conviction under section 9–112(b)(4).

■ Appellant's arguments to the contrary are without merit. He asserts that he planned to wait for a pause in the proceedings after the House vote on the appropriations bill, and that his desire to do so negates his intent to "impede, disrupt, or disturb" the House session. At best, his testimony to that effect presented an issue for the jury, which was entitled to disregard what he said in the courtroom and base its verdict on what he actually did in the House gallery. Moreover, the evidence showed that the House was in session for the duration of appellant's statement, and there is no basis for us to

conclude that the "pause" between the end of the vote and the next activity was available to appellant for his own petitioning activity.[5]

## IV

■ Finally, appellant argues that two statements made by the prosecutor during the rebuttal portion of his closing argument were improper. In addition, appellant contends that the prosecutor improperly characterized the testimony about the Speaker's use of his gavel as conclusive evidence of an "interruption" of the House session.

■ The first statement about which appellant complains was a metaphor in which the prosecutor referred to the behavior of his own child as an example of an act with unintended consequences:

> I have four kids; my oldest one is seven years old. And we're having problems with him now about (inaudible). And, you know, he could—he'll go by [my wife] and say something, and she'll get angry because of the way he speaks to her. Then he'll go by again and say it again, and she'll get angry again. And he'll go by again and say it again. So should he be able to say to me, well, Dad, I was speaking to Mom that way and I intended to speak to her, and I intended for her to hear me, but I certainly didn't intend for her to get mad, after she's already got mad three times before that because of the way that he spoke?
>
> Well, that's exactly what the defendant wants you to believe.

---

5. At trial, the testimony about the "pause" in the proceedings was not in agreement. Appellant testified that the voting had just concluded at the time he made his statement from the gallery. Officer Schauf stated, however, that the vote was ongoing, and Officer

Jeffrey Harmon, another member of the Capitol Police, said that the voting had just begun. In any event, regardless of the status of the vote, all of the testimony—even that of appellant—confirmed that the House was in session.

Appellant argues that this statement was an impermissible comment about his prior arrests for similar conduct in the House gallery.[6] He did not object to this statement below, however, on this or any other ground, and therefore we review it only to determine whether the trial judge committed plain error by failing to intervene *sua sponte*. *See, e.g., Harris v. United States,* 602 A.2d 154, 159 (D.C.1992) (en banc); *McGrier v. United States,* 597 A.2d 36, 41 (D.C.1991); *Irick v. United States,* 565 A.2d 26, 33 (D.C.1989).

We think appellant's interpretation of the prosecutor's words is strained, at best. *See Donnelly v. DeChristoforo,* 416 U.S. 637, 643–644, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974); *Lee v. United States,* 668 A.2d 822, 831 (D.C.1995); *Irick,* 565 A.2d at 33–34. Read in context, the prosecutor's remark was undoubtedly meant to rebut appellant's claim that he did not have the specific intent to commit the act prohibited by the statute. We find no basis for concluding that the jury could construe the prosecutor's statement to mean that appellant had been arrested on two earlier occasions for the same conduct, especially when no evidence whatever of appellant's prior conduct was ever heard by the jury. There is no rational connection between the story about the prosecutor's child and the fact, unknown to the jury, that appellant had been arrested on two prior occasions for similar crimes. Nor did the prosecutor's statement impermissibly encourage the jury to "send a message" to the defendant or others who might be inclined to act similarly. *See Bowman v. United States,* 652 A.2d 64, 71 (D.C.1994) ("[j]uries are not in the message-sending business"); *Coreas v. United States,* 565 A.2d 594, 604–605 (D.C.1989). It did conjure the image of a disobedient child, but it did not link appellant to the disobedient child for purposes of punishment. Nor did it mischaracterize the evidence because it responded to appellant's argument about his lack of specific intent. There is no ground for reversal in the prosecutor's anecdote about his son.

The second challenged prosecutorial remark asked the jury to imagine a gallery full of people like appellant. The prosecutor was attempting to rebut appellant's assertion that section 9–112(b)(4) "doesn't say its illegal to address Congress" and that "the law doesn't take [the lack of representation for District of Columbia residents] into account." In part of his rebuttal, the prosecutor presented the image of a whole "gallery full of Ben Armfields" protesting against District of Columbia appropriation bills and the potential chaos that would ensue:

Imagine this. You all looked at the gallery, and you saw [in a photograph] how full it was, or how full it could be. . . . It goes halfway around the chamber. Imagine the gallery full of Ben Armfields, and everybody's mad about (inaudible). Nobody is happen [*sic*] in Congress (inaudible).

This comment by the prosecutor is a bit more troubling because the verbal picture of a whole gallery full of protesters wanders rather far afield of the evidence. The evidence before the jury showed that appellant was standing alone in the gallery. The prosecutor should at least have hesitated before imagining a situation different from the facts of the case just to emphasize a rhetorical point. Nevertheless, we are satisfied that the prosecutor's remark did not inject "substantial prejudice" into the trial to a degree that would warrant

---

**6.** Before the trial began, the court ruled that the government could not present evidence of appellant's prior arrests for similar conduct.

reversal. *See, e.g., Scott v. United States,* 619 A.2d 917, 924 (D.C.1993) (citing cases). The government's case was strong, and we have no reason to believe that the prosecutor's argument impermissibly swayed the jury toward a guilty verdict that it would not otherwise have returned. *See, e.g., Hammill v. United States,* 498 A.2d 551, 555–558 (D.C.1985).

 Finally, appellant contends that the court improperly allowed the prosecutor to characterize the testimony about the Speaker's use of the gavel as proof of a "disruption" of the House. However, immediately after the prosecutor recited the facts regarding the gavel, the court instructed the jurors that the issue of whether there was a "disruption" was for them to decide, and that the evidence about the use of the gavel was for them to consider when addressing that issue. We therefore conclude that if there was any error resulting from the prosecutor's comment about the gavel (which we doubt), it was cured by the court. *See, e.g., Scott,* 619 A.2d at 926.

### V

Appellant's conviction is therefore *Affirmed.*