*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

## No. 19-CM-1030

RIVES MILLER GROGAN, APPELLANT,

V.

UNITED STATES OF AMERICA, APPELLEE.

Appeal from the Superior Court
of the District of Columbia
(2018-CMD-18979)

(Hon. Robert Salerno, Trial Judge)

(Argued Sept. 17, 2021                         Decided March 17, 2022)

*Mark L. Goldstone* for appellant.

*Elizabeth Gabriel*, Assistant United States Attorney, with whom *Michael R. Sherwin,* Acting United States Attorney, and *Elizabeth Trosman*, *Suzanne Grealy Curt*, *Andy Wang*, and *Joshua Gold*, Assistant United States Attorneys, were on the brief, for appellee.

Before GLICKMAN, EASTERLY, and DEAHL, *Associate Judges*.

DEAHL, *Associate Judge*:   Seconds after the fall of the gavel to end the Senate's session on November 27, 2018, Rives Grogan stood up from his seat in the Senate gallery and began to preach loudly about the evils of abortion.  He was promptly arrested and escorted, still shouting, into a nearby corridor.  There, a

plainclothes Capitol Police officer instructed him to "stop" and to "knock it off." Contrary to the officer's instructions, Grogan continued to shout as he was led down the hall. Grogan was tried before a jury for demonstrating within a United States Capitol building, D.C. Code § 10-503.16(b)(7) (2019 Repl.), and unlawful demonstration, D.C. Code § 22-1307(b) (2021 Supp.). The jury found him guilty on both counts, and Grogan was sentenced to two seven-day terms of imprisonment, to be served concurrently.

On appeal, Grogan makes the following five arguments: (1) that his dual punishment under § 10-503.16(b)(7) and § 22-1307(b) violates the Double Jeopardy Clause; (2) that the government substantially burdened his religious exercise in violation of the Religious Freedom Restoration Act (RFRA); (3) that both § 10-503.16(b)(7) and § 22-1307(b) are facially overbroad; (4) that the government failed to produce sufficient evidence to support a finding under § 22-1307(b) that Grogan continued to demonstrate after being instructed to cease by a law enforcement officer; and (5) that § 10-503.16(b)(7) is unconstitutional as applied to Grogan because the Senate gallery is a public forum.

Because we conclude that the legislature did not intend to authorize duplicative punishment for violations of § 22-1307(b) and § 10-503.16(b)(7), those

offenses should merge and we remand with instructions to vacate Grogan's conviction for unlawful demonstration under § 22-1307(b). Accordingly, we do not reach Grogan's argument that § 22-1307(b) is overbroad or his argument that the government failed to produce sufficient evidence to sustain his conviction under § 22-1307(b). Because we are unpersuaded by Grogan's other arguments, we affirm his conviction for demonstrating within a United States Capitol building under § 10-503.16(b)(7).

## I.

On the afternoon of November 27, 2018, Rives Grogan—a preacher at New Beginnings Christian discipleship—obtained a visitor pass and was escorted to the public Senate gallery inside the United States Capitol. For the rest of the afternoon, while the Senate was in session, he sat quietly and created no disturbance. However, "within seconds" of the fall of the gavel at the close of the day's session—while Senators and staff were still on the floor—Grogan stood up from his seat and began to preach loudly about his beliefs that abortion is "wrong." Doorkeeper Thomas Ford testified that in his eight years working in the Senate he had never heard anybody yell so loudly. Doorkeeper Todd Trautman agreed that Grogan's "outburst" was "as loud as [he] ha[d] heard" in his twenty years working in the

Senate. Capitol Police Officer Gene Aversano described Grogan's volume as "a shock to your system," and "like jumping in a cold pool of water."

"Almost immediate[ly]" after Grogan began to shout, Officer Governor Latson restrained Grogan and escorted him into an adjacent hallway. Grogan continued to yell as he was led from the gallery. In the hallway, Officer Aversano, a plainclothes Capitol Police officer who arrived to assist Latson, instructed Grogan to "stop" and to "knock it off." Grogan continued to yell, in defiance of Aversano's instructions, later testifying he did so because "I don't surrender my First Amendment right, even when I am detained." Grogan kept shouting as he was escorted away down the corridor.

This was not Grogan's first encounter with the Capitol Police. Grogan testified that he had been arrested "multiple times" for his conduct outside the Capitol building, including "twice outside on the steps" and once on a nearby sidewalk. Additionally, Grogan had previously been convicted of disorderly conduct for preaching about abortion within the Capitol Rotunda, and for disrupting the Senate while in session. Grogan testified that he and Latson were familiar with each other from previous encounters in the Senate: "[H]e knows how I react. I know how he reacts. I speak, he escorts me out." Aversano testified that, on the day in

question, he had recognized Grogan from their "previous interactions" and anticipated Grogan might "pop off" and disturb proceedings on the floor.

Grogan was no stranger to Senate gallery itself. Grogan testified he had visited the Senate multiple times before the day in question, and each time obtained a visitor pass. Printed on the back of each pass are the "rules" for spectators in the Senate gallery, including the following: "No one in the gallery is permitted to applaud or can commit any other type of demonstration either by sound or sign." Additionally, each pass warns that "[a]ny disturbance or infraction of these rules is justification for expulsion and/or arrest." While Grogan testified that he did not read the rules on the back of his visitor pass on this particular occasion, he was generally familiar with them. He expected to be removed from the gallery as a result of his actions, even though he did not believe he was breaking the law when he waited until after the Senate adjourned to speak.

The government initially charged Grogan with disorderly and disruptive conduct on United States Capitol Grounds, in violation of D.C. Code § 10-503.16(b)(4) (Count 1). It eventually dropped that charge and, in its place, charged Grogan with two other offenses: demonstration within a United States Capitol

building, in violation of § 10-503.16(b)(7)[1] (Count 2); and unlawful demonstration, in violation of § 22-1307(b)[2] (Count 3). On October 3, 2019, Grogan went to trial on Counts 2 and 3. After a two-day jury trial before the Honorable Robert Salerno, Grogan was found guilty of both counts. On October 24, 2019, Judge Salerno sentenced Grogan to seven days' incarceration for each count, to run concurrently.

On appeal, Grogan argues: (1) that his dual punishment under § 10-503.16(b)(7) and § 22-1307(b) violates the Double Jeopardy Clause; (2) that the government substantially burdened his religious exercise in violation of the Religious Freedom Restoration Act (RFRA); (3) that both § 10-503.16(b)(7) and § 22-1307(b) are facially overbroad; (4) that the evidence was insufficient to support a finding under § 22-1307(b) that Grogan continued to demonstrate after being instructed to cease by a law enforcement officer, and (5) that § 10-503.16(b)(7) is unconstitutional as applied to Grogan because the Senate gallery is a public forum.

---

[1] "It shall be unlawful for any person or group of persons willfully and knowingly . . . [t]o parade, demonstrate, or picket within any of the Capitol Buildings." D.C. Code § 10-503.16(b)(7).

[2] "It is unlawful for a person, alone or in concert with others, to engage in a demonstration in an area where it is otherwise unlawful to demonstrate and to continue or resume engaging in a demonstration after being instructed by a law enforcement officer to cease engaging in a demonstration." D.C. Code § 22-1307(b).

Grogan raised only the first three arguments before the trial court.[3]  We address his arguments in turn, though because we conclude his § 22-1307(b) conviction merges into his § 10-503.16(b)(7) conviction, we ultimately do not resolve his overbreadth and sufficiency challenges to the former conviction.

**II.**

"The Fifth Amendment guarantee against double jeopardy protects not only against a second trial for the same offense, but also against multiple punishments for the same offense."  *Whalen v. United States*, 445 U.S. 684, 688 (1980) (internal quotation marks omitted).  "Because the substantive power to prescribe crimes and determine punishments is vested with the legislature, the question under the Double Jeopardy Clause whether punishments are 'multiple' is essentially one of legislative intent."  *Ohio v. Johnson*, 467 U.S. 493, 499 (1984) (citations omitted); *see also Byrd v. United States*, 598 A.2d 386, 388-89 (D.C.1991) (en banc) ("The role of the constitutional guarantee against double jeopardy is limited to assuring that the court does not exceed its legislative authorization by imposing multiple punishments for

---

[3] Grogan raised his Double Jeopardy challenge in a pre-trial motion to dismiss. He raised his RFRA defense twice: in a motion to admit evidence of a video depicting the end of Senate proceedings on the day of his arrest, and as part of a motion for judgment of acquittal at the end of the government's case.  He raised his overbreadth challenge as part of that same motion for judgment of acquittal.

the same offense."). When a defendant, in a single trial, is convicted under multiple provisions the legislature intended to punish as a single offense, Double Jeopardy requires that those convictions "merge" for the purpose of sentencing. *Mooney v. United States*, 938 A.2d 710, 724 (D.C. 2007) (requiring the trial court to vacate one of two merged convictions); *see also Robinson v. United States*, 946 A.2d 334, 340 (D.C. 2008) (applying *Blockburger* to concurrent sentences); *Doepel v. United States*, 434 A.2d 449, 459 (D.C. 1981) (merger is required even where, as here, duplicative punishments run concurrently).

To determine whether the legislature intended to impose multiple punishments, we begin with the default rule articulated by the Supreme Court in *Blockburger v. United States*: "where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not." 284 U.S. 299, 304 (1932); *see also* D.C. Code § 23-112 (2012 Repl.) (codifying *Blockburger* as an "express declaration of legislative intent," *Thomas v. United States*, 602 A.2d 647, 649 (D.C. 1992)). But the *Blockburger* test is not dispositive. If "the legislature has clearly indicated a contrary intent with respect to the particular offense at issue," then that legislative intent—rather than the *Blockburger* analysis—controls. *In re M.S.*, 171 A.3d 155,

158 (D.C. 2017). Therefore, our merger inquiry consists of two steps. We first apply *Blockburger* and ask whether each offense requires proof of an element the other does not, and then ask whether there was a clear legislative intent sufficient to override the presumptive answer yielded in step one.

## A.

Under *Blockburger*, "the proper question is whether each offense contains distinct statutory elements, not whether the same evidentiary fact was used to prove an element of more than one offense." *Hanna v. United States*, 666 A.2d 845, 853 (D.C. 1995) (citing *Grady v. Corbin*, 495 U.S. 508, 521 n.12 (1990), *overruled on other grounds*, *United States v. Dixon*, 509 U.S. 688, 704 (1993)). The prototypical application of *Blockburger* is the merger of a lesser-included offense into a more serious offense—where "the elements of the lesser offense are a subset of the greater one" such that the elements of the greater offense can never be proven without also proving the elements of the lesser-included offense. *Nkop v. United States*, 945 A.2d 617, 621 (D.C. 2008) (merging simple assault into attempted misdemeanor sexual abuse); *Gathy v. United States*, 754 A.2d 912, 919 (D.C. 2000) (merging assault with a deadly weapon into aggravated assault while armed). Under a strict application of *Blockburger*, the offenses here would presumptively not merge because each

requires proof of a fact the other does not: § 10-503.16(b)(7) requires proof that the demonstration occurred "within any of the Capitol Buildings," while § 22-1307(b)(1) does not; and § 22-1307(b)(1) requires proof that the demonstrator persisted "after being instructed by a law enforcement officer to cease," while § 10-503.16(b)(7) does not.

The first part of our inquiry is not quite so straightforward, however, because in *Whalen*, the Supreme Court added some nuance to the *Blockburger* analysis. *See* 445 U.S. at 693-94. In *Whalen*, the Court considered whether, under D.C. law, a defendant could be punished for both rape and "killing the same victim in the perpetration of" certain felony offenses (i.e., felony murder), when the felony murder statute included as one of its elements "the commission or attempted commission of *rape or of one of five other specified felonies*, in the course of which the killing occurred." *Id*. at 685-86 (emphasis added). A straightforward application of *Blockburger* would indicate that the legislature did not intend rape and felony murder to merge; the former does not require proof of killing, and the latter does not require proof of carnal knowledge (because rape is only one of a list of potential felony-murder predicates). *See id.* at 709 (Rehnquist, J., dissenting).

The *Whalen* Court determined otherwise, holding that "the *Blockburger* rule leads to the conclusion that Congress did not authorize consecutive sentences . . . since it is plainly not the case that 'each provision requires proof of a fact which the other does not.'" *Id.* at 693 (quoting *Blockburger*, 284 U.S. at 304). The Court reasoned:

> There would be no question [that two offenses would be the same under *Blockburger*] if Congress, instead of listing the six lesser included offenses in the alternative, had separately proscribed the six different species of felony murder under six statutory provisions. It is doubtful that Congress could have imagined that so formal a difference in drafting had any practical significance, and we ascribe none to it.

*Id.* at 694. The Court, skeptical that Congress's decision to codify felony murder as a single provision was probative of its intent to authorize cumulative punishment, considered the felony murder statute as if it were broken into six separate provisions, one for each predicate offense. *Id.* Then, observing that each hypothetical provision would merge under *Blockburger*, it determined that the unified provision should produce the same result. *See id.* at 693-94 ("A conviction for killing in the course of a rape cannot be had without proving all the elements of the offense of rape."). *Whalen* departs from the normal operation of *Blockburger* because it indicates that, in a narrow subset of cases, two offenses should merge even when the elements of

each can be proven without proving the elements of the other.[4] *See also Pelote v. District of Columbia*, 21 A.3d 599, 604-07 (D.C. 2011) (merging reckless driving into felony flight where the latter offense was predicated on proof of violation of the reckless driving statute, despite the existence of alternative predicates that were not proven).[5]

Grogan urges us to employ a *Whalen*-type analysis here. He correctly points out that unlawful demonstration under § 22-1307(b) requires proof that a demonstration occurred "in an area where it is otherwise unlawful to demonstrate," and that the only predicate illegality for that offense was that Grogan protested within a United States Capitol building in contravention of § 10-503.16(b)(7).[6] Or, to put Grogan's argument into *Whalen*'s language: "A conviction for [unlawful

---

[4] It may have been more sound conceptually if *Whalen* concluded that the District's felony murder and rape statutes were distinct offenses under *Blockburger*'s test, but that it was nonetheless apparent that the legislature did not intend to authorize duplicative punishments for those offenses. But that was not the Court's reasoning, 445 U.S. at 693, and we are not at liberty impose our own conceptual framework on the result it reached.

[5] *Cf. Lewis v. United States*, 255 A.3d 966, 970-71 (D.C. 2021) (declining to merge reckless driving into felony flight where the jury found the defendant culpable for both reckless driving and the additional predicate offense of property damage).

[6] The government points to no provision other than § 10-503.16(b)(7) that would render Grogan's demonstration "in an area where it is otherwise unlawful to demonstrate."

demonstrating in the Capitol] cannot be had without proving all the elements of [demonstrating in the Capitol]." *Whalen*, 445 U.S. at 693-94.

The argument has some force,[7] though we disagree with its conclusion. *Whalen*'s reasoning applies where the greater offense (e.g., felony murder) incorporates a set of alternative lesser offenses (e.g., rape), and then tacks on an aggravating factor (e.g., a killing). In that scenario, we might naturally say the legislature intended to authorize punishment for either an aggravated or a lesser-included form of the same offense, but not both. *See, e.g.*, *Whalen*, 445 U.S. at 693-94; *Pelote*, 21 A.3d at 607 (more serious offense of felony flight merges with lesser predicate of reckless driving).

_____

[7] The government, at oral argument, suggested that one way in which the unlawful demonstration statute does not resemble the felony murder statute is that the felony murder statute enumerates an exhaustive list of six specific predicate offenses, whereas the unlawful demonstration statute does not specifically identify any predicate offenses. The unlawful demonstration statute instead refers to the more generic predicate of demonstrating in any area "where it is otherwise unlawful to demonstrate," without enumerating the specific statutory provisions that proscribe demonstrating in certain areas. We do not think the distinction is a meaningful one because we doubt the legislature "could have imagined that so formal a difference in drafting"—expressly listing each predicate code offense versus referring to a limited set of offenses more generically—"had any practical significance." *Whalen*, 445 U.S. at 694.

Here, we confront the inverse scenario, and the same reasoning does not apply. In this case it is the less-serious offense of unlawful demonstration that (a) depends on the more serious predicate of demonstrating in a Capitol building, and (b) authorizes a less-severe penalty than the predicate itself upon proof of an additional element. *Compare* § 22-1307(c) (punishable by ninety days' imprisonment), *with* § 10-503.18(b) (punishable by six months' imprisonment). In this situation, we have consistently treated the offense with an additional element but less-severe penalty as an "enhanced penalty provision," rather than an aggravated form of the predicate offense. *See, e.g., Hanna*, 666 A.2d at 856 (possession of a firearm during a crime of violence does not merge with kidnapping, even though the latter served as a predicate for the former); *see also Thomas*, 602 A.2d at 650 (same). That is for good reason: it would be quite odd, and borderline incoherent, to presume that the legislature intended a less-serious offense as an aggravated form of a more serious one. *Blockburger*, and *Whalen*'s gloss thereon, were crafted to be indicators of legislative intent; we decline to extend either to presume merger in a scenario where the far more natural presumption is the opposite.

Because we conclude that *Whalen*'s gloss on the *Blockburger* analysis does not apply to the scenario before us, we adhere to a straightforward application of *Blockburger*. Under that analysis, § 22-1307(b) requires proof that a defendant

resumed demonstrating after being instructed to cease, while § 10-503.16(b)(7) does not; and § 10-503.16(b)(7) requires proof that a demonstration occurred within one of the Capitol buildings, while § 22-1307(b) does not. It makes no difference under this typical *Blockburger* analysis that the evidence introduced to prove that Grogan's demonstration occurred "in an area where it is otherwise unlawful to demonstrate" also proved the elements of demonstrating within a Capitol building. We therefore find that the *Blockburger* inquiry creates a presumption that § 10-503.16(b)(7) and § 22-1307(b) are separate offenses that do not merge.[8]

---

[8] Grogan also points to *Haye v. United States*, 67 A.3d 1025, 1030 (D.C. 2013), in which we cited *Blockburger* to merge a conviction for unlawful entry into a conviction for criminal contempt of a conditional-release order, which required the defendant to stay away from a particular building. *See also United States v. Dixon*, 509 U.S. 688, 694, 699 (1993) (Scalia, J., plurality opinion) (concluding that Double Jeopardy Clause precludes duplicative punishment for a substantive criminal offense and contempt based on the same offense). *Haye* and *Dixon* are in some tension with our reasoning here because the "relatively petty offense" of criminal contempt will often carry a lighter sentence than the offense that triggered the violation of the contempt order. *See Dixon*, 509 U.S. at 718 (Rehnquist, J., dissenting in part). Mindful of this tension, we ultimately find our criminal contempt jurisprudence inapposite. One animating purpose of the Double Jeopardy inquiry is to protect the exclusive authority of the legislature to define and punish crimes. *See Byrd*, 598 A.2d at 388; *cf. United States v. Wiltberger*, 18 U.S. 76, 95 (1820) (invoking "the plain principle that the power of punishment is vested in the legislative, not in the judicial department"). But when a defendant is punished under both a criminal statute and a court order that incorporates that statute by reference, the duplicative punishment is authorized not by the legislature, but by a judge. *Dixon*, 509 U.S. at 697-98 (Scalia, J., plurality opinion) ("Dixon's cocaine possession . . . was not an offense under [D.C. Code] § 23–1329 until a judge incorporated the statutory drug offense into his release order."); *Haye*, 67 A.3d at 1028 (same). In that scenario, we are required to look past the elements of the criminal contempt statute (the words of

**B.**

Our inquiry cannot stop there, however. *Blockburger* gives rise only to a presumption, and that presumption can be overcome by evidence of a contrary legislative intent, provided it is sufficiently clear. *Whalen*, 445 U.S. at 691-92. Where the legislature expresses a clear intent not to authorize duplicative punishments, the Double Jeopardy clause requires merger without regard to *Blockburger*'s presumptive answer. *See Parker v. United States*, 692 A.2d 913, 916 (D.C. 1997) ("*Blockburger*'s presumptive rule that offenses do not merge if they require proof of different facts, can be overcome by a clear indication of contrary legislative intent.") (cleaned up).

Here, there is clear evidence that when the D.C. Council enacted D.C. Code § 22-1307(b), it intended only to authorize a less-severe alternative to charging somebody for demonstrating in a Capitol building under § 10-503.18, not an additional punishment. Section 22-1307(b) is a relatively new provision passed as

---

the legislature) and scrutinize each provision of the court order (the judge's words). Otherwise, we would endorse the proposition that the legislature, by passing a criminal contempt statute, intended to cede its exclusive authority to make criminal law and allow judges to impose multiple punishments at their discretion.

part of the Omnibus Criminal Code Amendments Act of 2012. *See* 60 D.C. Reg. 3390 (Mar. 15, 2013). The preamble to that Act describes its purpose as follows:

> [T]o return prosecutorial authority on certain matters to the Office of the Attorney General, and to permit a charge *for a less serious offense* where one or more persons demonstrate in an area where it is not permitted and remain or return to the area after receiving a warning from law enforcement.

*Id.* (emphasis added). The stated intent of the Council in passing this provision was to create a less serious offense that could be prosecuted by the Attorney General of the District of Columbia *in lieu of* charges for more serious offenses, such as D.C. Code § 10-503.16(b)(7), which are prosecuted by the United States Attorney for the District of Columbia.[9] That intent would be undermined if, as occurred here, the U.S. Attorney's Office could bring both charges and secure separate punishments for each of them. That was plainly not the Council's intent. This preamble indicates that the legislature intended to create a hierarchy of offenses, with the lesser offense prosecutable by the District's Attorney General, not to authorize cumulative punishment.

---

[9] In the District of Columbia, most prosecutions are "conducted in the name of the United States by the United States attorney for the District of Columbia." D.C. Code § 23-101(c) (2012 Repl.). Prosecutions under § 22-1307 are an exception to that rule, and "shall be conducted in the name of the District of Columbia" by the Attorney General. D.C. Code § 23-101(b).

This conclusion is bolstered by the text of D.C. Code § 10-503.18. After providing that a conviction for demonstrating in a Capitol building under § 10-503.16(b) is punishable by no more than six months, it states as follows:

> Whenever any person is convicted of a violation of this part and of the general laws of the United States or the laws of the District of Columbia, in a prosecution under this subsection, the penalty which may be imposed for such violation is *the highest penalty authorized by any of the laws for violation of which the defendant is convicted*.

D.C. Code § 10-503.18(c) (emphasis added). We find this statutory text sufficiently clear. Congress intended that the penalty under § 10-503.16(b)(7) should attach only when it is "the highest penalty authorized" for the respective violations—as is the case here—and to yield when any higher penalty is authorized for a more serious offense brought in the same prosecution.[10] Because, in this case, § 10-503.16(b)(7) has the "highest penalty authorized," we conclude that both Congress (when it enacted § 10-503.16(b)(7)) and the D.C. Council (when it subsequently

---

[10] For instance, if a person is prosecuted for demonstrating in a Capitol building in violation of § 10-503.16(b)(7), and at the same time is prosecuted for discharging a firearm in a Capitol building in violation of § 10-503.16(a)(1)(B), it is the latter's more severe penalty alone ("imprisonment not exceeding 5 years") which applies. D.C. Code § 10-503.18(a), (c). Not both. Likewise, if § 22-1307(b) were punishable by more than six-months imprisonment, that harsher penalty alone would apply to the two convictions here per the terms of D.C. Code § 10-503.18(c).

enacted § 22-1307(b)) intended only that singular penalty to apply for the convictions here.

We hold that Grogan's dual punishment under § 22-1307(b) and § 10-503.16(b)(7) was not authorized by the legislature, and that only the more serious penalty authorized by § 10-503.16(b)(7) applies. We therefore remand to the trial court with instructions to merge the two offenses and vacate Grogan's conviction under § 22-1307(b).

## III.

The Religious Freedom Restoration Act (RFRA) provides a "defense to persons whose religious exercise is substantially burdened by government." 42 U.S.C. § 2000bb(b)(2) (2018).

> An individual asserting a . . . defense under RFRA must show by a preponderance of the evidence that the government action in question would substantially burden the sincere exercise of his religion, whereupon the burden of proof shifts to the government to show that the action (1) would further a compelling governmental interest (2) that cannot be effectuated by less restrictive means.

*Nesbeth v. United States*, 870 A.2d 1193, 1196 (D.C. 2005). "The government substantially burdens religion when it puts substantial pressure on an adherent to

modify his behavior and to violate his beliefs, or requires an individual to choose between abandoning his religious principle or facing criminal prosecution." *De Béarn v. United States*, 237 A.3d 105, 113 (D.C. 2020) (quotation marks and citations omitted). Although a court may consider whether a religious belief is sincerely held, "it is not for us to say" whether a religious belief is reasonable, "mistaken or insubstantial." *Burwell v. Hobby Lobby*, 573 U.S. 682, 724-25 (2014); *see also* 42 U.S.C. § 2000cc-5(7)(A) ("The term 'religious exercise' includes any exercise of religion, whether or not compelled by, or central to, a system of religious belief."). Therefore, where (as here) the sincerity of a party's beliefs is not at issue, "[w]hether a government action substantially burdens a [party's] religious exercise is a question of law for a court to decide." *Singh v. McHugh*, 185 F. Supp. 3d 201, 210 (D.D.C. 2016). We therefore consider the issue de novo.

Grogan maintains that his conduct in the Senate gallery was "the result of an honest conviction that he must personally spread the word of God about abortion in the public square." He argues the trial court erred by impermissibly questioning whether his religious beliefs were reasonable, *see Burwell*, 573 U.S. at 724, and that the trial court was instead required to find a substantial burden of his religious exercise and shift the burden to the government to prove Grogan's arrest was the

least restrictive means to further a compelling interest.[11]  We disagree.  Assuming the reasonableness and sincerity of Grogan's religious beliefs, we find that Grogan failed to show by a preponderance of the evidence that the government substantially burdened the exercise of his religion.  *See Nesbeth*, 870 A.2d at 1196.

The government does not substantially burden the exercise of religion when it restricts only "one of a multitude of means" to accomplish a religious end. *Henderson v. Kennedy*, 253 F.3d 12, 17 (D.C. Cir. 2001) (no substantial burden when a regulation prohibited the sale of t-shirts on the National Mall because a religious organization could "still distribute t-shirts for free on the Mall, or sell them on streets surrounding the Mall"); *see De Béarn*, 237 A.3d at 113-14 (no substantial burden when a stay-away order barred a man from entering "the [Catholic] church of his choice," because the man remained free to "go to other churches"); *Mahoney v. Doe*, 642 F.3d 1112, 1121 (D.C. Cir. 2011) (no substantial burden when a

___

[11] Grogan further contends that the government would fail to carry its burden, because its interest in maintaining order in the Senate ceased to be compelling at the close of the day's legislative session.  Because we find that Grogan has not made a prima facie case, we do not reach this argument.  However, we note that Senators and staff were still on the floor when Grogan started shouting, and that it is far from clear that the government's interest in "[p]reventing 'disruption of the orderly conduct of the legislature's business,'" *Tetaz v. District of Columbia*, 976 A.2d 907, 915 (D.C. 2009) (quoting *Smith-Caronia v. United States*, 714 A.2d 764, 766 (D.C. 1998)) is strictly confined to the hours in which the Senate is officially in session.

regulation prohibited writing chalk messages on the sidewalk in front of the White House, because a man who wanted to write a religious message remained free to "spread his message through picketing, a public prayer vigil," or even "chalking elsewhere").

Because Grogan's removal from the Senate gallery was "at most a restriction on one of a multitude of means" of accomplishing a religious end, *Henderson*, 253 F.3d at 17, it was not a substantial burden of his religious exercise. Notwithstanding the prohibition against preaching in the Senate gallery, Grogan remained free to "spread the word of God about abortion" elsewhere in the public square, including within the Capitol Rotunda or just outside of the Capitol building. *See Wheelock v. United States*, 552 A.2d 503, 506 (D.C. 1988) (recognizing the Capitol Rotunda as "a unique situs for demonstration activity"); *Markowitz v. United States*, 598 A.2d 398, 407 (D.C. 1991) (noting "[n]umerous other alternatives to a demonstration in the restricted area" of the Capitol, including "the grounds just outside of the Capitol buildings").[12] Even if we assume that Grogan's beliefs required him to communicate

---

[12] While the terms of § 10-503.16(b)(7)'s proscription would seem to apply anywhere within the Capitol building—including its Rotunda—we have previously provided narrowing interpretations of the statute to allow for more robust First Amendment activity in the Capitol Rotunda, as discussed below in Part IV. Also, while Grogan testified that he has previously been arrested for both preaching in the Capitol Rotunda and for preaching just outside of the Capitol building, the situs of

directly with Senators, there are "other ways in which" concerned citizens "can make their views known to Congress besides speaking from the House or Senate gallery." *Armfield v. United States*, 811 A.2d 792, 797 n.3 (D.C. 2002) (noting that citizens can "write letters," "make speeches," or even "contact the media to convey their message[]"). Although the government's actions here undoubtedly restricted the manner in which Grogan could lawfully pursue a religious end, it fell far short of forcing him to "choose between abandoning his religious principle or facing criminal prosecution." *De Béarn*, 237 A.3d at 113 (internal quotation marks omitted). Accordingly, we find that Grogan failed to raise a prima facie defense under RFRA.

## IV.

We next consider Grogan's overbreadth challenge to D.C. Code § 10-503.16(b)(7). We have no occasion to address his separate overbreadth challenge to § 22-1307(b), as we have concluded that conviction must be vacated on other grounds. *See supra* Part II.

---

those protests alone would not make them criminal offenses, though the nature of them might. *See infra* Part IV.

"The First Amendment overbreadth doctrine permits an individual whose own speech or conduct may be prohibited to challenge a statute on its face 'because it also threatens others not before the court—those who desire to engage in legally protected expression but who may refrain from doing so rather than risk prosecution.'" *Pearson v. United States*, 581 A.2d 347, 356 (D.C. 1990) (quoting *Bd. of Airport Comm'rs of City of Los Angeles v. Jews for Jesus, Inc.*, 482 U.S. 569, 574 (1987)).  "[A] law may be invalidated as overbroad if a 'substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep.'" *United States v. Stevens*, 559 U.S. 460, 473 (2010) (quoting *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449 n.6 (2008)).  "Due to the severity of the only remedy for overbreadth, namely, complete invalidation of the regulation or statute, courts have a 'duty to avoid constitutional difficulties' by applying an appropriate narrowing construction where possible." *Pearson*, 581 A.2d at 356 (quoting *Boos v. Barry*, 485 U.S. 312, 331 (1988)); *see also Gomez v. United States*, 490 U.S. 858, 864 (1989) ("It is our settled policy to avoid an interpretation of a federal statute that engenders constitutional issues if a reasonable alternative interpretation poses no constitutional question.").  Although we will not "rewrite a law" to save it from unconstitutionality, *Stevens*, 559 U.S. at 481, "[t]here is no requirement that a [narrowing] construction must be derived from the express language of the statute, merely that the statute itself be susceptible to the

narrowing construction." *Pearson*, 581 A.2d at 358. Because overbreadth is a question of law, we review the issue de novo. *See City of Houston, Tex. v. Hill*, 482 U.S. 451, 458 n.6 (1987).

Grogan argues that § 10-503.16(b)(7) is overbroad for three reasons. First, he contends the word "demonstration" encompasses "a virtually unlimited array of verbal or nonverbal evidence," including commonplace activities like "silently wearing an armband, [or] a nun bowing her head when she hears something she disagrees with." Second, Grogan contends § 10-503.16(b)(7) does not distinguish between different areas of the Capitol, and thus applies an impermissibly burdensome standard to, for instance, the Capitol Rotunda, which we have acknowledged to be "a unique situs for demonstration activity." *Wheelock*, 552 A.2d at 506. Third, Grogan argues that § 10-503.16(b)(7) fails to distinguish between different times of day, applying the same standard when Congress is in session as it does after-hours, when the government no longer has a significant interest in preventing disruption to legislative functions. We are not persuaded by any of these arguments.

This is not the first time we have entertained an argument that § 10-503.16(b)(7) criminalizes conduct protected by the First Amendment.[13] *See, e.g., Markowitz*, 598 A.2d at 400-01; *Wheelock*, 552 A.2d at 508. Nor have we failed to respond. To "save [§ 10-503.16(b)(7)] from being unconstitutionally overbroad," we have adopted the "tourist standard"—a narrowing construction under which we construe § 10-503.16(b)(7) to prohibit only "demonstrations that involve conduct more disturbing than the actions of a tourist would normally be, while taking into consideration the right of the people to freedom of expression." *Hasty v. United States*, 669 A.2d 127, 130-31 (D.C. 1995) (citing *Markowitz*, 598 A.2d at 409 n.16). We have further clarified that this narrowing construction, "upon request and where supported by the evidence, must be the subject of proof at trial."[14] *Id.* at 133-34 (reversing a conviction for demonstrating within the Capitol buildings because the jury instructions failed to incorporate the tourist standard).

---

[13] This provision was previously codified at D.C. Code § 9-112(b)(7), which is the citation referenced in most of our precedents. *See, e.g.*, *Markowitz*, 598 A.2d at 400 n.1. While the provision is now codified at § 10-503.16(b)(7), the statutory text has not changed.

[14] Although the question of overbreadth does not turn on the application of the provision to Grogan, we note that the tourist standard was incorporated into the jury instructions given to the jury at Grogan's trial.

Taking the tourist standard into account here, all three of Grogan's overbreadth challenges fail. The benign activities Grogan suggests could be prosecuted under § 10-503.16(b)(7)—such as a nun bowing her head or a spectator wearing an armband to convey a political message—do not violate the statute because they are not more disturbing than the behavior of a typical tourist. The tourist standard also differentiates between different areas of the Capitol. *Compare Wheelock*, 552 A.2d at 504-05, 506, 508 (finding that a demonstration in which fifty people sat on the floor of the Capitol Rotunda, prayed, and chanted did not run afoul of the tourist standard because the Rotunda is a "unique situs for demonstration activity"), *with Markowitz*, 598 A.2d at 401, 409 (finding that a demonstration in which ten to fifteen people sat on the floor in a restricted corridor and "began to unfurl" a banner was not protected by the tourist standard because it occurred in a location where tourists were normally not even allowed to enter). Finally, Grogan's third argument—that the statute's prohibitions are constitutional only to the extent that the prohibited activity actually impacts legislative functions—was explicitly rejected in *Markowitz*. *Compare* 598 A.2d at 408 ("Although ample evidence showed that appellants actually disturbed the conduct of the business of Congress, the trial judge did not have to make such a finding under the statute and refrained from so doing."), *with id.* at 411 (Rogers, C.J., dissenting) ("[T]he statutory term

'demonstrate' is properly construed to apply only to expressive conduct which is disruptive because it is incompatible with the orderly functioning of Congress.").

Moreover, "it is basic law that even if there are marginal applications in which a statute would infringe on First Amendment values, facial invalidation because of overbreadth is inappropriate if the remainder of the statute covers a whole range of easily identifiable and constitutionally proscribable conduct." *Smith-Caronia v. United States*, 714 A.2d 764, 767 (D.C. 1998) (cleaned up) (quoting *Parker v. Levy*, 417 U.S. 733, 760 (1974)). That is the case here. The government has a "substantial" interest in "[p]reventing 'disruption of the orderly conduct of the legislature's business,'" *Tetaz v. District of Columbia*, 976 A.2d 907, 915 (D.C. 2009) (quoting *Smith-Caronia*, 714 A.2d at 766), and may therefore regulate demonstrations within the Capitol buildings that represent "potential interference with or disturbance of the activities of Congress." *Markowitz*, 598 A.2d at 401, 408 n.15. We find that the government's substantial interest in preventing such disruptions, combined with the additional protections of the tourist standard, makes it unlikely that "a substantial number of [§ 10-503.16(b)(7)'s] applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *Stevens*, 559 U.S. at 473. Accordingly, we reject Grogan's contention that § 10-

503.16(b)(7)—as construed under the tourist standard—is unconstitutionally overbroad.[15]

## V.

Finally, Grogan argues that § 10-503.16(b)(7) is unconstitutional as it was applied to him because the Senate gallery is a traditional public forum (or, in the alternative, a designated public forum), and the government cannot show that its restriction of Grogan's speech was "narrowly tailored to serve a significant public interest." *Bloch v. District of Columbia*, 863 A.2d 845, 849 (D.C. 2004). Grogan did not raise this issue below, so our review is only for plain error. "Under plain error review, [an] appellant must show that (1) there was an error, (2) the error was

---

[15] Grogan also argues the tourist standard itself is improper because it rewrites rather than reinterprets the statute. *See Stevens*, 559 U.S. at 481. Not so. The tourist standard construes the word "demonstrate" in a manner borne by the text, *Pearson*, 581 A.2d at 358, and fully consistent with the purpose and legislative history of the law. *Markowitz*, 598 A.2d at 413 & n.4 (Rogers, C.J., dissenting) (observing that § 10-503.16(b)(7) was enacted to balance two competing concerns: ensuring "that Congress can transact its business in an orderly manner" and "that there is no infringement on the rights of the people . . . to assemble peaceably and to petition the Government for a redress of grievances." (quoting Senate Hearings (Sept. 21, 1967) (statement of Sen. Jordan))). The tourist standard simply looks to legislative purpose to firm up the contours of an ambiguous term. *See Peoples Drug Stores, Inc. v. District of Columbia*, 470 A.2d 751, 754 (D.C. 1983) (en banc) ("[A] court may refuse to adhere strictly to the plain wording of a statute in order to effectuate the legislative purpose, as determined by a reading of the legislative history or by an examination of the statute as a whole." (cleaned up)).

plain, and (3) the error affected his substantial rights. If all three conditions are met, an appellate court may then exercise its discretion to notice a forfeited error, but only if (4) the error seriously affects the fairness, integrity, or public reputation of judicial proceedings." *Portillo v. United States*, 62 A.3d 1243, 1258 n.17 (D.C. 2013) (internal citations omitted). "To be 'plain,' an error should be 'clear or obvious, rather than subject to reasonable dispute.'" *In re Taylor*, 73 A.3d 85, 99 (D.C. 2013) (quoting *Puckett v. United States*, 556 U.S. 129, 135 (2009)).

Here, it is neither clear nor obvious that § 10-503.16(b)(7) was unconstitutional as applied to Grogan. We have explicitly declined to decide whether the Senate gallery is a public forum. *See Smith-Caronia*, 714 A.2d at 766 (noting the "limited utility" of engaging in forum analysis when the "nature and extent of government regulation at issue would withstand First Amendment analysis" regardless). Moreover, even if we assume, for purposes of argument, that the Senate gallery is a public forum, we do not think it is "clear or obvious," *Taylor*, 73 A.3d at 99, that § 10-503.16(b)(7) is not a legitimate time, place, and manner restriction, "narrowly tailored to serve a significant public interest." *Bloch*, 863 A.2d at 849. The government has a well-established interest in "preventing disruption of the orderly conduct of the legislature's business," *Tetaz*, 976 A.2d at 915 (cleaned up), and it is not clear that this interest evaporates when the gavel strikes, particularly

when Senators are still on the floor. We conclude that the trial court did not commit plain error when it failed to deem § 10-503.16(b)(7) unconstitutionally overbroad as applied to Grogan in this case.

## VI.

Because we find that the legislature intended § 22-1307(b) to merge into § 10-503.16(b)(7), we remand the case to the trial court with instructions to vacate Grogan's conviction under § 22-1307(b). Because we are not persuaded that the government substantially burdened the exercise of Grogan's religion under RFRA, that § 10-503.16(b)(7) is facially overbroad, or that the trial court committed plain error when it failed to deem § 10-503.16(b)(7) unconstitutionally overbroad as applied to Grogan, we affirm Grogan's conviction under § 10-503.16(b)(7).

*So ordered.*